BRYAN SCHRODER
United States Attorney

JONAS M. WALKER
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
Email: jonas.walker@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>   vs.<br><br>MARTIN THORNLEY ELZE,<br><br>                Defendant. | No. 3:18-CR-00110-01-SLG |

**SENTENCING MEMORANDUM**

**I.**    **REQUESTED SENTENCE**

    **Incarceration**......................................................................................**41 months**

    **Supervised Release** ................................................................................. **3 years**

    **Special Assessment** ...............................................................................**$100.00**

## II. SENTENCING GUIDELINES

The presentence report ("PSR," doc. 65) calculates a total offense level of 14, a criminal history category of IV, and a Guideline range of 27 to 33 months. The government concurs with this calculation.

## III. FACTORS ENUMERATED BY CONGRESS IN 18 U.S.C. 3553(a)

### 1. (a)(1): Offenses and offender

Nature and circumstances of offense

The defendant, Martin Thornley Elze, was caught red-handed stealing a mammoth tusk that belonged to the people of the United States. The tusk had been displayed at the Campbell Creek Science Center ("CCSC"), a BLM museum, for approximately 20 years, during which time tens of thousands of visitors personally experienced the prehistoric artifact. Patterson victim letter, Ex. 1 at 1.

On or about March 7, 2018, the defendant and co-conspirator "cased" the CCSC. PSR at 10.

> It quickly became clear that the individuals were not interested in the CCSC's programs and recreational resources, and that their main focus was on the mammoth tusk. The individuals asked specific questions about the weight and authenticity of the tusk. Staff, including myself, were concerned about the situation and safety of CCSC visitors and ourselves, and requested the presence of law enforcement. The situation left us uneasy as we closed the building for the night.

Patterson victim impact letter, Ex. 1 at 1.

On or about the night of March 8, 2018, the conspirators returned to the CCSC. PSR at 9. Co-conspirator Boyd used a rock to break a window at the CCSC, causing $1,385.22 in damage. PSR at 9; Plea Agreement at 7-8. After Boyd removed the tusk from the CCSC,

the co-conspirators worked together to carry away the tusk. PSR at 9.



The next morning, CCSC personnel learned that their suspicions had been well-founded.

The effects on the staff have been considerable.

> These staff members still report that they are frightened of an encounter like this happening again. They say it is difficult to relax and focus on their mission of serving the public. Many have said their interactions with the public and ability to fulfill this mission has been compromised out of fear of being robbed or burglarized. Where once they trusted everyone who walked through the CCSC doors and focused solely on facilitating positive educational experiences, they are now forced to invest a great deal of energy into increased vigilance for very real safety concerns and security of the property that they are charged with managing.

Murphy victim impact letter, Ex. IOS 2 at 2.[1]

---

[1] The government is attaching the three victim impact letters (*i.e.* IOS Exhibits 1-3) because the defense has indicated it opposes the PSR's inclusion of those exhibits. If, for whatever reason, the victim impact letters are stricken from the PSR, they will remain in the record

When it was its original condition, prior to being plundered and cleaved, the mammoth tusk was worth about $7,000 to $9,000. Plea Agreement at 5. The defendant committed this crime for pecuniary gain. Id. at 9. The defendant cut the mammoth tusk into pieces and sold them. Id. at 4. The conspirators succeeded in their crime, at least insofar as they received the money resulting from the theft, destruction, and sale of the mammoth tusk, which was never returned to the BLM.

To be sure, this was no random burglary. This was a commercial heist that, but for the CCSC's security system, would likely have succeeded. As the Acting State Director for BLM notes, "there is a strong nexus between the theft and sale of paleontological and archeological resources and the illicit drug trade, itself a national epidemic." Murphy victim impact letter, IOS 2 at 3. The conspirators targeted this tusk knowing that they occupied the lowest rungs of a smuggling scheme that had the potential to generate significant wealth for corrupt dealers and collectors for years into the future.

> Unfortunately, the theft of archeological and paleontological resources is not a problem specific to Alaska. The illegal theft and sale of these types of artifacts is a multimillion-dollar, international industry. Thefts of this nature have been prolific on public lands in the Lower 48 for some time, but it is our belief that this is one of the first few successful prosecutions under the Paleontological Resources Protection Act since its passage in 2009. . .
> The majority of these thefts in the contiguous United States take place on federal public lands. In Alaska, artifact and resource theft from public and Native corporation lands is already a significant problem, and the potential is high for this illegal industry to expand.

Murphy victim impact letter, Ex. IOS 2 at 3.

//

//

---

as attachments to the government's sentencing memorandum.

U.S. v. Elze
3:18-CR-00110-01-SLG                Page **4** of **11**
Case 3:18-cr-00110-SLG   Document 67   Filed 04/02/19   Page 4 of 11

The defendant was not an ignorant thief who unwittingly stole a particularly valuable artifact without realizing its importance. Rather, he has experience working with and selling ivory.[2] The defendant carved ivory while serving time at Spring Creek Correctional Center.[3] After serving his sentence, the defendant possessed ivory in a truck prior to the burglary.[4] After the date of the CCSC burglary, the defendant instructed a person to assist in the selling of ivory.[5] The purpose of selling the ivory was to pay rent.[6]

Although the defendant has pled guilty, he has not lifted a finger to help recover the stolen tusk. Even now, as the Court contemplates sentences for Boyd and Elze, the conspirators' clients or customers, whoever and wherever they are, still possess and enjoy their ill-gotten quarry.

The full impact of this selfish offense exceeds the enduring distress among the 65 CCSC employees and the financial loss to the United States; this was a crime against the scientific and cultural heritage of all Americans.

> Mammoth tusks from Alaska are some of the best preserved in the world and are sought after by museums everywhere because of their beauty and ability to captivate the publics' fascination with ancient life. They are also some of the most scientifically informative fossils from the last Ice Age; tusks can be easily sexed (male or female), they reveal the animals age at death (they add new tusk incrementally each year) and they can even reveal information about the diet, climate home range of the individual. As you can see, each tusk is a treasure trove of potential information that once lost can never again

---

[2] In an abundance of caution, the government is filing Ex. IOS 8 under seal because it contains Grand Jury testimony. *See* generally Ex. IOS 8.

[3] *See* Ex. IOS 8 at highlighted portions on pages 12-13.

[4] *See* Ex. IOS 8 at page 13.

[5] *See* Ex. IOS 8 at pages 15-16; 22-24.

[6] *See* Ex. IOS 8 at page 24.

be regained. Fossils from public lands are also a national treasure and a non-
renewable resource.

Druckenmiller victim impact letter, Ex. IOS 3.

## The defendant's obstruction of justice

The defendant knew that the government was investigating him long before the Indictment was filed on September 20, 2018. He learned this information from at least two sources: one was the government itself; another was the defendant's friend, C.A., whom the defendant was charged with assaulting (PSR para. 53; and PSR page 32).

On May 17, 2018, the case agent, BLM Special Agent Coley Gentzel, attempted to interview the defendant while he was at the state courthouse for a hearing in a pending criminal case, *Anchorage v. Elze*, 3AN-17-08548cr. During the interview, Special Agent Gentzel's remarks clearly put the defendant on notice that he and the co-defendants were suspects, and that the government was seeking return of the tusk. *See* Ex. IOS 5 at highlighted portions on page 4. Special Agent Gentzel's comments also informed the defendant that the similarities of boot prints in the snow at the scene of the crime, compared with prints taken from boots found in the defendant's personal property at the Anchorage Correctional Complex, constituted important evidence linking him to the crime Id. at highlighted portion of page 6.

Approximately one month later, on June 15, 2018, the defendant spoke by phone with C.A. The call was recorded because the defendant was in custody, awaiting trial in the misdemeanor domestic violence assault case of *Anchorage v. Elze*, 3AN-17-08548cr,

in which C.A. was the victim.[7] The defendant had many phone calls with C.A. while awaiting trial for assaulting her; some of those phone calls included discussions of the status of the BLM investigation. On that particular date, the defendant and C.A. discussed the fact that the government has subpoenaed C.A. to testify before the federal grand jury. *See* Ex. IOS 6 at highlighted portion on pages 4-5 and 10 (referring to C.A.'s testimony on "Wednesday")[8]. The defendant explained the function of a Grand Jury to C.A. Id. Given his knowledge about the importance of the boots in linking him to the crime, the defendant urged C.A. to falsely testify that C.A.'s boots were, in fact, the defendant's. Plea Agreement, doc. 48 at 5; Ex. IOS 8 and highlighted portions.

If C.A. had testified falsely, and if the Grand Jury had believed C.A.'s false testimony, then the likelihood of the defendant escaping liability for this offense could have significantly increased. Fortunately, the defendant's scheme failed.

In the Plea Agreement (doc. 48 at 9), the defendant agrees that this phone call was a willful attempt to obstruct or impede the administration of justice and that the two-level enhancement of U.S.S.G. § 3C1.1. applies.

History and characteristics of offender

The 52-year-old defendant has been in custody or on some form of criminal supervision nearly his entire adult life.

//

---

[7] Compare PSR at 53, and PSR at page 32.
[8] *See, also,* Ex. IOS 8.

In 1984, the defendant was arrested for his first burglary approximately six months after his 18th birthday. PSR at 35. Following his first felony conviction approximately three months later (PSR at 35), the defendant has apparently remained in custody or under some form of criminal justice supervision, almost without exception[9], for his entire adult life – a period of approximately 34 years. The defendant's criminal history is so extensive that he has three felony convictions, including two burglaries, for which he received no criminal history points. PSR at 35 and 38.

In 1989, at age 22 years, the defendant attempted to murder a person whom he believed was the sole witness who could link him to a robbery conspiracy. *See* PSR at 39; *see also* Ex. IOS 4: State v. Elze, 1997 WL 401579 (Alaska Ct. App. July 16, 1997) (explaining factual basis and affirming conviction). Police foiled the defendant's scheme by assigning an undercover officer to assume the role of the intended target. IOS 4 at 1-2. When the defendant entered the hotel where he planned to murder the witness, police ordered him to freeze. Id. at 2. The defendant fled to a different hotel nearby, threw away his firearm and ammunition, and hid for two hours until the police found him. Id.

Beginning in 2003 and continuing to the present day, the defendant performed poorly on parole supervision. PSR at 39 (identifying nine occasions upon which the parole board placed the defendant into abscond status or revoked his parole, or the defendant otherwise violated). While released from custody and under parole supervision in the

---

[9] Per the sentences identified in PSR paragraphs 35-37, the defendant may have been off supervision in approximately 1988.

Alaska attempted murder case, the defendant committed an offense and failed to appear in Idaho (PSR at 40); further, he committed two offenses, including one felony, in Washington (PSR at 41 and 42).

The defendant has benefited from orders dismissing prosecutions due to suppression of evidence (PSR at 46, regarding a robbery with a short-barrel shotgun) and due to a speedy trial problem (PSR at 53, regarding a domestic violence assault and unlawful contact). The defendant's conduct in the dismissed domestic violence assault case is particularly troubling because the victim in that case was C.A., the same person whom the defendant unlawfully induced to commit perjury before the federal Grand Jury investigating this case.

### 2. (a)(2): Needs of the sentence

The government's proposed sentence, followed by three years of supervised release, will protect the public, reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter the defendant. Despite a lifetime of supervision and incarceration, the defendant has demonstrated an unwillingness to conform his conduct to the law.

General deterrence is a particularly appropriate consideration because this crime was not random. The defendant was familiar with ivory; he visited the CCSC prior to the burglary to assist in planning; he committed the offense with at least one other co-conspirator; he cut up the tusk for personal profit, and has not assisted authorities in recovering it. The intended audience for general deterrence are the corrupt collectors and dealers who have already, and may continue to, profit from this particular crime and similar

paleontological thefts.

### 3. (a)(3): Kinds of sentences available

Probation would not be an appropriate sentence in this case, in light of the nature of the offense and defendant's prior conduct.

### 4. (a)(4): Sentencing range

The Plea Agreement does not compel the government to recommend a sentence within the guideline range.

The government's proposed sentence is above the guideline range because the guideline range inadequately reflects the severity of the defendant's criminal history, and, further, because of the organized nature of the offense and the defendant's benefit from it.

The government recommends a sentence of 41 months, which is at the high end of guideline range with the next-highest offense level (*i.e.* 14/V).

### 5. (a)(6): Need to avoid unwarranted disparity

The defendant likely believed that the benefit he would receive from committing this offense was worth the risk of being caught because the sentence he would receive, if prosecuted by the State of Alaska, would be relatively low. The Court, however, may not consider the sentence the defendant would have received in a hypothetical state prosecution for the same offense. In U.S. v. Williams, 282 F.3d 679 (9th Cir. 2002), the Ninth Circuit vacated and remanded for resentencing when the district found the disparity between federal and state sentencing laws to be "eminently unfair." The Ninth Circuit noted that "[a]llowing this result to stand would undermine the goal of uniformity that Congress sought to ensure in enacting the Guidelines, because every federal sentence would become

dependent upon the practice of the state within which the federal court sits. We decline to permit such a result to occur." Id. at 682.

### 6. (a)(7): Need for Restitution

The government respectfully requests the Court order the defendant to pay $8,385.82 in restitution to the Campbell Creek Science Center. *See* PSR at 7 (referring to $7,000 for the tusk plus $1,385.82 to repair the CCSC door).

## IV. CONCLUSION

The United States respectfully proposes the Court impose the sentence described above.

RESPECTFULLY SUBMITTED April 2, 2019, in Anchorage, Alaska.

BRYAN SCHRODER
United States Attorney

s/ Jonas M. Walker
JONAS M. WALKER
Assistant U.S. Attorney
United States of America

**CERTIFICATE OF SERVICE**
I hereby certify that on April 2, 2019,
a true and correct copy of the foregoing was
served electronically on the following:

David Nesbett

s/ Jonas M. Walker
Office of the U.S. Attorney